IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

| | | |
|---|---|---|
| NORMAN LEE BIRL JR. | § | |
| v. | § | CIVIL ACTION NO. 9:10cv36 |
| DIRECTOR, TDCJ-CID | § | |

<u>MEMORANDUM OPINION AND ORDER OF DISMISSAL</u>

The Plaintiff Norman Birl, an inmate of the Texas Department of Criminal Justice, Institutional Division proceeding *pro se*, filed this lawsuit originally as an application for the writ of habeas corpus under 28 U.S.C. §2254 complaining of disciplinary action taken against him during his confinement in TDCJ-ID. The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in the proceeding pursuant to 28 U.S.C. §636(c). The Defendants currently in the case are Sgt. Leontyne Haynes, Major Craig Fisher, disciplinary hearing officer Wade King, assistant warden Gregg Oliver, and regional grievance administrator Cheryl Lawson.

The lawsuit was originally filed as an application for the writ of habeas corpus challenging a disciplinary proceeding. Birl complained that he was convicted of the disciplinary offense of trafficking and trading. The evidence offered at the disciplinary hearing showed that Kathy Kussmaul, the mother of another prisoner, Richard Kussmaul, deposited $170.00 into Birl's inmate trust account, without approval through administrative channels. Haynes, the charging officer, spoke to Kathy Kussmaul and was told that Richard had asked Kathy to send money to other inmates, and that Richard told her who and how much to send. This was discovered during an investigation into possible extortion at the Eastham Unit.

Birl asserted that he never asked Kathy Kussmaul to send him money; he says in a grievance that he knew nothing of the transaction until after it had occurred and asserted that the disciplinary

charge offered no explanation for the deposits. In his original habeas petition, he stated that there was no evidence to support the finding of guilt and that his classification and good time credits were taken without due process. He says that at the hearing, the charging officer alluded to the possibility that the other inmate was paying Birl for legal work, but the officer conceded that Birl had not told him that. Birl says that he testified that he did not know about the deposits until after they had been made and that he did not participate in the deposits, but he was nonetheless found guilty without any evidence. As punishment for the disciplinary case, Birl received 45 days of cell and commissary restrictions, reduction in classification status from State Approved Trusty III to Line Class I, and the loss of 30 days of good time credits. In his response to the answer, Birl alludes to having commissary items taken and having a hold placed on his account, but the disciplinary records show that neither of these actions were part of the punishment imposed in the case.

The district court dismissed the habeas petition because Birl did not show the deprivation of a constitutionally protected liberty interest. Sandin v. Conner, 115 S.Ct. 2293, 2301 (1995). On appeal, the Fifth Circuit denied Birl a certificate of appealability concerning the liberty interest claims (i.e. the challenge to the disciplinary case insofar as this case resulted in cell and commissary restrictions, classification status, and the loss of good time credits), but granted a certificate of appealability on the question of whether the property interest claims were cognizable under 42 U.S.C. §1983.

In its opinion, the Fifth Circuit stated as follows:

> Prisoners claims alleging deprivations of property interest without due process of law are plainly cognizable under §1983. *See, e.g.*, McCrae v. Hankins, 720 F.2d 863, 869 (5th Cir. 1983), *abrogated on other grounds by* Hudson v. Palmer, 468 U.S. 517, 531, 533 (1984), *as recognized in* Augustine v. Doe, 740 F.2d 322, 328 and n.10 (5th Cir. 1984) (explaining that where prisoners are permitted to possess property, they have a protected interest in their property and §1983 provides a remedy if prison officials deprive prisoners of this interest without due process).

Because Birl's petition combined habeas corpus claims with claims that should properly proceed under 42 U.S.C. §1983, the Fifth Circuit stated that it is proper for the district court to consider in the first instance whether Birl's property interest claims may proceed under Section 1983.

The Fifth Circuit instructed that should the district court reach the merits of Birl's claims, the court should determine whether those claims implicate deprivations of protected property interests and whether the due process requirements of <u>Wolff v. McDonnell</u>, 418 U.S. 539 (1974) were satisfied.[1]

After the remand, Birl was ordered to file an amended complaint on a Section 1983 form, inasmuch as his complaint was being construed under Section 1983 rather than as a habeas corpus petition. In this amended complaint, Birl stated that on September 23, 2009, Sgt. Haynes entered 2 Dorm and confiscated all of Birl's commissary purchases without giving him a reason. Later that same day, he was told that he was under investigation for extortion. Haynes told him at that time that if she found no evidence of extortion, his property would be returned to him.

On October 7, 2009, Haynes concluded her investigation. The next day, Birl was notified by a counsel substitute that he was being charged with trafficking and trading. The next day, he appeared before Captain King for his disciplinary hearing. The officer's report was read into evidence. Haynes stated that she was conducting an investigation into Kussmaul because his mother had sent money to Birl and other inmates. Haynes stated that she had interviewed Birl and that Birl had told her that he and Richard were going to have a birthday together and that he had been helping Richard with his legal work. Birl said that Kussmaul would go to family visits and then come back and tell Birl that his mother had put money on Birl's books. Haynes stated that Birl also told her that he had known Kathy Kussmaul for years.

Birl complains that his inmate trust account has been frozen since September 23, 2009. During the disciplinary hearing, he says that he tried to offer evidence in the form of book orders from Kathy Kussmaul to him, but Captain King refused to allow Birl to introduce this evidence. He

---

[1] <u>Augustine</u> did not involve a prisoner and cites <u>McCrae</u> only for the proposition that prior to <u>Hudson</u>, most courts had held <u>Parratt v. Taylor</u>, 451 U.S. 527 (1981) inapplicable to intentional deprivations of liberty and property, whereas <u>Hudson</u> extended <u>Parratt</u> to such claims. The applicability of <u>McCrae</u> is limited in any event because that case precedes <u>Hudson</u> and thus was decided without the benefit of that opinion.

states that he was found guilty based solely on the charging officer's report and the records of the inmate trust fund.

Birl filed grievances to appeal this disciplinary case, but these were denied by Warden Oliver and Cheryl Lawson. He then wrote to officials at the TDCJ Inmate Trust Fund Department asking that the hold on his account be lifted, but to no avail. He also filed grievances concerning the hold on his trust account, and was told at the Step Two level that the hold would remain in place until the amount of illegally received funds was forfeited. Birl complains that the hold on his account has prevented him from acquiring indigent postage and the "Chaplain program for hygiene," and says that "Plaintiff has been denied and deprived of his wrongful confiscated commissary property by the acts, acts, and co-acts [sic] of the Defendants that is being used as punishment toward plaintiff and in retaliation for resisting the wrongful confiscation of his property and the illegal hold placed on his account."

After Birl filed his amended complaint, an evidentiary hearing was conducted in the lawsuit. At this hearing, Birl testified that on September 23, 2009, Sgt. Haynes came to his living area and confiscated all of his commissary products. Birl later learned that he was under investigation for extortion. In October, he received a disciplinary case because another inmate's mother, Kathy Kussmaul, had sent him money on three occasions, totaling $170.00.

As a result of the investigation, Birl said, a hold was placed on his account, which is still there. Birl's family had been sending him money, but it was confiscated. He also says that he received $100.00 from an "insurance settlement" the day before the hold was put on his account. All of his commissary items were "liquidated," with $74.00 worth of items being taken; however, Birl says, he only got credit for about $30.00.

After the investigation, Birl stated that he did not get a disciplinary case for extortion, but rather for trafficking and trading. Captain King decided that he was guilty even though there was no evidence. Birl argued that the disciplinary report did not say that any trafficking and trading had taken place, saying that he was like "a member of the family" of the Kussmauls. Birl stated that

Richard Kussmaul, Kathy's son, another inmate at the Eastham Unit, had his own money, and that he, Birl, was a "fatherly figure" to Richard.

Birl stated that he was told that the hold was put on his account because he was getting paid for doing legal work. He argued that Kathy Kussmaul could put money on everyone's inmate account if she wanted to, and that Richard had been telling his mother to put money on Birl's account. Birl denied helping Richard with legal work although he said that their criminal cases had some similarities.

Birl maintained that the question was whether or not there was enough evidence of trafficking and trading, which he said that there was not. He stated that he had affidvits from Richard and Kathy Kussmaul and that a warden had told him that any money recouped would be put in the "officers' general fund."

Birl also alleged at the evidentiary hearing that his account was closed and his property confiscated in retaliation. When asked about this, Birl explained that Haynes "did not like how he responded" and indicated that she retaliated against him by filing the trafficking and trading charge when she realized that the extortion charge would not stand up. He acknowledged that about 30 inmates were charged with trafficking and trading as a result of the investigation.

After the evidentiary hearing, the Defendants were ordered to answer the lawsuit. Birl filed a response to the answer. The Defendants have also filed a motion for summary judgment, to which Birl has likewise filed a response.

<u>The Defendants' Motion for Summary Judgment</u>

In their motion for summary judgment, the Defendants state that Birl received a disciplinary case for trafficking and trading by receiving an unauthorized commodity transfer from another inmate. During 2008 and 2009, they say, Kathy Kussmaul deposited thousands of dollars into the trust accounts of 14 different inmates, including 27 deposits of $85.00 and nine deposits of $75.00. Birl received two deposits of $75.00 and one deposit of $20.00, for a total of $170.00.

When TDCJ officials noticed the pattern of deposits, they began an extortion investigation. Haynes interviewed Kathy Kussmaul, who stated that her son Richard had asked her to send money to other inmates, and that he told her how much to send and to whom.

The deposits to Birl's account took place in June, July, and December of 2008. On September 23, 2009, Haynes confiscated all of Birl's commissary goods pending an investigation into allegations of extortion. She returned Birl's toothbrush holder, two soap dishes, and eye drops because he could prove ownership of these items.

On October 7, 2009, the Defendants state that Haynes filed a disciplinary case charging Birl with receiving an unauthorized commodity transfer from Richard Kussmaul. Birl was notified of the charges on October 8, and a hearing was held on October 9, 2009, at which Birl was found guilty.

Turning to their legal arguments, the Defendants first contend that to the extent that Birl complains that the deprivation of his property was unlawful, his claims are barred by the *Parratt/Hudson Doctrine* because he had adequate state post-deprivation remedies available to him. Second, the Defendants assert that Birl's due process claims lack merit because he received all of the process which he was due at the disciplinary hearing. In addition, the Defendants state that although Birl argued that he was not allowed to introduce evidence of book orders during his disciplinary hearing, he was allowed to testify that the deposits which he received from Kathy Kussmaul were to purchase books, and that Birl has never disclosed the book orders which he says that he was prevented from offering into evidence. The Defendants further assert that Birl did not exhaust this claim because he never claimed in any of his grievances was that he was not allowed to offer book orders into evidence.

Third, the Defendants state that Birl's due process claim lacks merit because sufficient evidence was offered to support the finding of guilt. Fourth, they contend that the due process claims lack merit because his claims necessarily implicate the validity of the disciplinary case and this case has not been overturned.

Fifth, the Defendants argue that prisoners do not have a federally protected right to have their grievances investigated and their disciplinary cases resolved to their satisfaction, so the fact that he was convicted in the disciplinary proceeding and this conviction was not overturned on appeal did not violate his constitutional rights. Sixth, the Defendants state that Birl does not have a federally protected right to the possession of property which was purchased with unauthorized funds. They contend that an inmate who chooses to possess property while in prison thereby consents to TDCJ's property rules, and that these rules specify that a prisoner's personal property may be confiscated at any time, from any location, for specified reasons, one of which is if "ownership / legitimate possession is questionable."

In this case, the Defendants contend that Birl was found guilty of receiving $170.00 in an unauthorized commodity transfer from Kussmaul, which he then used to purchase commissary goods. They argue that "Birl failed to use the grievance process to show that he did not purchase the confiscated commissary goods with funds he received from offender Richard Kussmaul," and that Birl instead raises the meritless argument that his property should be returned because it was taken in an extortion investigation and he was ultimately convicted of trafficking and trading.

Similarly, the Defendants next argue that Birl does not have a federally protected right to possession of unauthorized funds. They state that a deposit from one inmate to another may be made only by transfer from one inmate trust account to another and have unit administrative approval, and that confirmed violations of deposits between inmates may result in disciplinary actions against any inmates involved in unauthorized transactions, whether depositors or recipients. Money received without authorization as described by these regulations may be forfeited.

In this case, the Defendants say, Birl was found guilty of receiving $170.00 in unauthorized deposits from Richard Kussmaul, rendering this money subject to forfeiture. His remedy for this forfeiture was to have his disciplinary case overturned, which he failed to do.

Eighth, the Defendants argue that Birl has not shown that the Defendants Oliver and Lawson had any personal involvement in any alleged constitutional deprivation. Instead, he sues these

persons for denying his grievances, for which he cannot maintain a constitutional claim. Ninth, the Defendants state that Birl cannot maintain a claim for damages against them in their official capacities under the Eleventh Amendment.

In their tenth ground for summary judgment relief, the Defendants argue that they do not have authority to grant the requested injunctive relief because their actions were mandated by TDCJ policy, which they lack authority to contravene. Finally, the Defendants maintain that their actions were objectively reasonable and so they are protected by qualified immunity.

<u>The Defendants' Summary Judgment Evidence</u>

The first item of summary judgment evidence was a grievance which was screened (i.e. returned unprocessed) as redundant. The next item is another grievance, no. 2010035306. In this Step One grievance, Birl complains of the confiscation of his property and says that he went to see Haynes afterwards. She told him that he was under investigation for extortion and that she could keep his property for 30 days, but that she would return the property within 30 days unless she filed extortion charges. She also explained what the investigation would consist of and why it was being conducted.

On October 8, 2009, the grievance says, he got a case for trafficking and trading, and that after this charge was filed, his inmate account was closed, which prevented him from purchasing items from the commissary. He says that "the confiscated commissary was money sent to me by my sister," and the money in his trust fund account came from an insurance check. Birl contends that the imposed restrictions after the 30-day period told to him violates his right to procedural due process and that without evidence of extortion, the hold on his account should have been lifted and the confiscated property should have been returned to him.

The response to this grievance states that Haynes did not tell him that his confiscated commissary property would be returned, although the investigation was for extortion and Birl was charged with trafficking and trading. The trust fund had been placed on hold and this hold would remain until the amount of unlawfully received funds was forfeited.

In the Step Two appeal of this grievance, Birl says that Haynes is a liar if she denies telling Birl that his property would be returned. He states that not only did Haynes tell him this, but she also told the same thing to almost every inmate who inquired about their property. Birl states that the property confiscated from himself and other inmates would be "used for official meetings, parties, and other social gatherings" for officers, making its confiscation a "marketable gain" by Haynes. Birl says that the use of confiscated property for such purposes is a "racketeering operation or a deceptive trade practice," and that he did not participate in any unauthorized commodity transfer; he attaches a statement, apparently signed by Kathy Kussmaul, stating that the money which she sent to him was a gift and that Richard did not ask that money be sent to Birl.

The response to the Step Two grievance appeal was that Birl had been appropriately advised at the Step One level and that his trust fund would remain on hold until the amount of illegally received funds was forfeited.

Next, the Defendants attach Birl's grievances concerning his disciplinary case. In grievance no. 2010025604, Birl complains that he was originally told he was under investigation for extortion, but got a case for trafficking and trading. During the hearing, Haynes introduced the offense report and his trust fund records into evidence, but no evidence was offered that proved or even remotely suggested that he had knowledge of or participated in a deposit of funds arranged by Richard Kussmaul through his mother acting as a third party.[2] As a matter of fact, Birl says, the evidence showed that he had no knowledge of the transfer being made by Richard by having his mother deposit money into his account. He says that the evidence did not show that the deposits were made on October 7, 2009, as the charge alleged, and that Richard did not testify at the hearing, nor was any statement from him introduced.

---

[2]In the summary judgment evidence, the names are blacked out, but it is apparent that Birl is referring to Richard and Kathy Kussmaul.

The response to this grievance was that sufficient evidence was presented to support the finding of guilt and that no significant due process or apparent procedural errors were noted to warrant overturning the case.

In his Step Two appeal of this grievance, Birl says that no prison employee offered evidence that he participated in a monetary transfer before he was punished. The disciplinary charges filed against him led to a loss of good time although there was no evidence to show guilt. Birl says that the charge was based on the fact that he received $170.00 that another inmate arranged for a third party, his mother, to deposit; the offense report did not specify why the money was deposited in his account and no evidence was offered to answer that question. Birl notes that he testified that he had no knowledge of a transfer or deposit until after the fact, and there was no evidence that he knew beforehand that a transfer would be made. Nor was there any evidence that a transfer was made at the date, time, and place listed in the offense report.

The response to the Step Two grievance appeal states that the disciplinary charge was appropriate for the offense and the guilty verdict was supported by a preponderance of the evidence. All due process requirements were satisfied and the punishment assessed was within agency guidelines, so no further action was warranted.

The next items of summary judgment evidence are forms reflecting the property which was confiscated, as well as a notation that two soap dishes, a toothbrush holder, and eye drops were returned to Birl. This is followed by the records of the disciplinary hearing.

The offense report charges Birl with making an unauthorized commodity transfer from Kussmaul to himself by having Kussmaul's mother send $170.00 to Birl's inmate trust account. The report reflects that the finding of guilt was based on the officer's report and testimony and that Birl received 45 days of cell and commissary restrictions, a reduction in classification status, and the loss of 30 days of good time as punishment.

The written hearing summary shows that Birl testified that he has known Kathy Kussmaul since 2004 and Richard Kussmaul since 1994. He said that "she buys me books and so he gives me books. I have never asked her or him for anything."

Sgt. Haynes testified that she was conducting an investigation into Kussmaul, which revealed that his mother sent money to Birl and others. When she interviewed Birl, he told her that he and Richard were going to have a birthday together and that he had been helping Kussmaul with some legal work. Birl told her that "every time I went to visit he would come back and say she put money on his books," and that he had known Kathy Kussmaul for years.

On cross-examination, Haynes said that Birl did not admit to requesting money and that he did not say that he was getting paid for helping with legal work. She indicated that Birl did not tell her whether or not he knew of the deposits before he received them, but that inmates get monthly statements of their accounts so he knew of the money. Haynes also noted that Birl did not get the money in one deposit but over a period of time.

The preliminary investigation worksheet shows that Birl was interviewed by his counsel substitute. The statement he made to her was that he had known Richard Kussmaul since 1994, and his family. Birl stated that he had never asked for Kussmaul or his mother to send him anything, but that she buys him books. He added that "Kussmaul comes back from visitation and tells me that his mom has sent me $."

The charging officer, Haynes, made a statement that it was not approved by the administration for Kussmaul to put money on Birl's books. She stated that she talked to Kathy Kussmaul and Kathy said that her son asked her to send money to offenders, and that he told her to whom and how much to send.

<u>Birl's Response to the Motion for Summary Judgment</u>

In his response to the motion for summary judgment, Birl states that on September 23, 2009, Haynes confiscated all of his commissary products without notice or an explanation. She later told him that he was under investigation for extortion. During the investigation, Haynes and Fisher

determined that an "authorized transfer" totaling $170.00 was placed in Birl's inmate trust account; the officers stated that this was payment for legal services, although Birl says that this is disputed.

Birl says that he was told by Haynes that if she found no evidence of extortion, his property would be returned. However, on September 24, 2009, Haynes asked Fisher to close Birl's inmate trust account. A hold was placed on his account that has denied him access to the funds in that account for almost four years. He did not receive his property back.

On October 8, 2009, Birl says, Haynes concluded her investigation and found that no extortion had occurred. Instead, she charged him with trafficking and trading. He entered a not guilty plea and was tried on the officer's report; Haynes testified as to her investigation and entered her report as evidence. She also entered Birl's name and transactions from someone else's trust fund. King, the hearing officer, refused to allow Birl the right to introduce portions of his evidence and found Birl guilty of the offense charged. As punishment, Birl received 45 days of cell and commissary restrictions, reduction in classification status, and the loss of 30 days of good time credits. He says that the disciplinary case "sealed the deal" on the confiscation of his property and was "a trial without evidence to support the verdict." None of Birl's appeals were successful.

After summarizing the Defendants' contentions, Birl says that there are genuine issues of material fact concerning his due process challenge. He points out that his version of events and that of the Defendants is markedly different and says that his commissary products were "confiscated and used for personal benefits, parties, club gatherings, etc., in opposition to departmental policies."

Second, Birl says that disputed facts exist concerning whether or not he was afforded due process in the disciplinary hearing. He says that there was no evidence to support the conviction because there was no evidence that Birl had Kussmaul deposit the money in his account or that Birl participated in the deposit. Nor was there any evidence offered as to why the money was put into his account unless "getting together on their birthday" is considered "evidence."

Birl states that the Defendants' brief on appeal to the Fifth Circuit asserts that prison officials alleged that the money was payment for legal services, but this assertion is refuted by Haynes'

written statement, which reflects that according to Haynes, Birl did not state that he was getting paid for helping with legal work.

Birl argues that "the sum total of the evidence offered by Defendant Haynes, and accepted by Defendant King, removed the requirement that Defendants prove that the transfer (deposit) was a bilateral transaction and that Plaintiff knew that the transaction would be made and that Plaintiff participated in the transaction." At most, he says, Haynes and King established that Kussmaul had made a deposit but did not show that Birl had Kussmaul do it or that Birl even knew about the deposit until after the fact.

Third, Birl argues that he was denied due process when King would not let him introduce evidence. Specifically, Birl says that he sought to offer the book orders which would have established that he and Kathy Kussmaul had a relationship which started long before the first deposit in this case. He says that this book order shows an "order received" date of October 25, 2007; Birl states that this would have given the hearing officer reason to believe that Kathy Kussmaul sent him money without his knowledge, although he does not explain how the book order makes such a showing. Birl argues that there was no reason why he should not have been allowed to offer this evidence and that his defense was hampered by the refusal to allow him to admit it, which refusal was made with no explanation.

Next, Birl states that there was no evidence presented to support the charge, and that the only evidence offered at the hearing was the report filed by Haynes. After he was convicted, Birl says that he filed multiple grievances, but Oliver and Lawson did not apply the "test for a due process violation" and refused to correct the wrongful conviction. Birl argues that Oliver and Lawson's failure to overturn the disciplinary conviction when they were obligated to do so precludes summary judgment because there are genuine issues of material fact which require a trial by jury.

Birl says that the case paints of a picture of him being in possession of funds which were not authorized, and using these funds to purchase commissary products. However, he says, the Defendants have not attempted to return the property even after learning that they were wrong to

have confiscated it in the first place. He says that his trust fund statement dated September 30, 2009, is a "critical document" against the assertion that he was in possession of unauthorized funds.

Birl says that he has a letter from his sister Marilyn Williams dated August 30, 2009, in which she says that she has sent him $75.00. On September 2, 2009, a deposit was made in his account for $75.00, and on September 16, he made a commissary purchase of $74.79, leaving him a balance of 0.22 (sic). On September 23, 2009, an insurance check for $100.00 was deposited in his account. That same day, his property was confiscated by Haynes, and a hold placed on his account which remains there to this day. Birl says that disputed questions of fact exist as to whether the property confiscated was purchased with authorized or unauthorized funds, noting that the Defendants have not offered records of his commissary transactions.

Birl next points to a letter from former assistant warden Debbie Erwin to Kathy Kussmaul which he says "begins to paint the picture of possible corruption" in order to justify the taking of his property because "defendants are maintaining a pecuniary interest in all property confiscated." He says that the incentive for confiscation is obvious and is fueled by procedures designed to achieve thousands of dollars in results." Specifically, Birl says that the letter says that forfeited money is placed in the Texas General Revenue Fund, making the Defendants "beneficiaries of the confiscation."

In this regard, Birl states that a hold was placed on his trust fund account until the sum of $170.00 was paid to the Texas General Revenue Fund. The money was a gift sent to him by Kathy Kussmaul, but that the dates of her deposits are "in total contrast from the date of the investigation and the filing for trafficking and trading." The date of the last deposit from Kussmaul was December 1, 2008, and by September 2, 2009, when the deposit from Marilyn Williams was made, no funds were on record as having been received from Kussmaul, so the money on his account at that time was legally authorized funds. The property confiscated from him had thus been purchased with legally authorized money.

Birl states that this property was seized from him, as well as other items, and through a process of "liquidation," the hold on his account was reduced from $170.00 to $139.13, through "a process believed to be fraud." Specifically, Birl says that the $74.79 in property seized from him was reduced to $30.87, which was "the amount Defendants liquidated in order to change it into currency which was then paid to the Inmate Trust Funds. Under this scenario, Birl says, "the same agency and agents (defendants) that confiscated plaintiff's currency that was purchased with legally authorized funds then used those funds after liquidation to pay a debt which defendants created to the Texas General Revenue Fund which is possibly linked to business by the Inmate Trust Fund. And, from the looks of it, the business of forfeiture/confiscation is more than just a disciplinary issue because it accumulates revenue. It is more than stock tank [sic]."

Birl points out that the disciplinary hearing could not have ordered a forfeiture because the forfeiture of funds is not a permissible disciplinary sanction, but that in order to "seal the deal on the illegal confiscation," King had to find him guilty of the charge of trafficking and trading. This finding was then used to justify the illegal confiscation of commissary items.

After again arguing that there was no evidence of trafficking and trading and that the commissary good were purchased with legally acquired money, Birl contends that the inmate trust fund account statement "is not an adequate representation of Plaintiff's account and it should not be used as such." As a matter of fact, he says, it isn't his account statement at all, although Birl does not explain what the document is or what he believes it to be.

According to Birl, the Defendants state that if an inmate is found guilty of "extorting" money deposited in his trust account, or has been received without authorization as described above, the offender shall forfeit title to the funds. He says that the defendants focus on the phrase "received without authorization," but argues that the paragraph begins with the phrase "found guilty of extorting money," which he was not.

Next, Birl states that the defendants admit that the money was "forfeited," but the question is, whose funds were confiscated so that it can be said that Birl was in possession of unauthorized

money. He questions whether the funds sent to him were unauthorized and thus eligible for confiscation and states that the forfeiture could have come about only through the disciplinary hearing's imposed punishment, but that forfeiture is not a permissible disciplinary sanction. Thus, Birl asks "where then did the forfeiture proceeding take place and by whose authority?"

Birl says that the defendants are liars and that a jury trial would reveal the truth of the matter, which is that he was in possession of commissary products which he was legally entitled to have because those products were purchased with legally authorized funds. Instead, Birl says that the money deposited in his trust account was money that he was legally entitled to possess, and the confiscated commissary goods were not purchased with any funds deposited in his account by Kathy Kussmaul, which money had been spent months earlier.

Returning to Oliver and Lawson, Birl agues that although these defendants did not directly commit due process violations, they became responsible for these violations when they failed to correct it . He states that supervisors who learn of constitutional violations through a report or appeal may be held liable to correct it, citing Williams v. Smith, 781 F.2d 319, 323-24 (2nd Cir. 1986). In particular, he states, prison officials who are designated to decide disciplinary appeals have the duty to conduct at least a "minimal investigation" when confronted with evidence of due process violations and can be held liable for failing to perform this duty, citing King v. Higgins, 702 F.2d 18, 21 (1st Cir.), *cert. denied*, 464 U.S. 965 (1983) and other cases. In the present case, Birl says, once it became apparent that a serious and substantial constitutional violation had occurred, King knew that there was no evidence but nonetheless found him guilty, which Birl says is proof of deliberate indifference.

Similarly, Birl maintains that "it cannot be argued that Defendants Oliver and Lawson did not learn of the due process violations and deprivations of property in this case." He points out that he identified these violations in his grievances, so they "knew just what to look for."

Birl argues that disputed issues of fact exist as to the claim of Eleventh Amendment immunity. He says that the First Judicial District Court of Appeals has stated that suing TDCJ

employees in their official and individual capacities is not the same as suing both the governmental entity and the employees, so the employees did not have to be dismissed from the lawsuit, citing Quarterman v. Hampton, 21 S.W.3d 864 (Tex.App.-Houston [1st Dist.] 2010, no pet.). Birl specifies that he is seeking injunctive relief against the defendants in their official capacities.

Furthermore, Birl contends that "the interests of the Texas Attorney General's Office representing private officials who are employed as officials in TDCJ strongly suggest that when the Defendants finally lose in this case, the State of Texas will pay the damage award." He goes on to say that "to maintain representation in this case, the Attorney General's Office must attempt to make a case from the various doctrines of immunity, otherwise they would be caught employing themselves or that office in the capacity of 'public defender.'" He says that Eleventh Amendment immunity has no application to this case because he is not suing a state or state agency.

Finally, Birl argues that the Defendants are not entitled to qualified immunity because whether or not they had actual knowledge that their actions were unlawful is irrelevant, because qualified immunity has an objective and not a subjective standard. He states that there is no immunity for actions which contravene "common sense and state regulations" and that the Defendants have failed to show that they did not violate clearly established law in depriving him of legally authorized funds used to purchase commissary products.

Birl reiterates that he was told by Haynes that if she did not find any evidence of extortion, she would return his property in 30 days. However, before the 30 days had elapsed, Birl was charged with trafficking and trading, which Birl says was done for the sole purpose of maintaining control of the commissary products. He states that the disciplinary hearing and the finding of guilt, which was based upon no evidence, was "a procedure designed to coincide with the illegal confiscation that was used to justify that procedure and to 'seal the deal' on the deprivation of Plaintiff's property." As a result of these procedures, Fisher - who could have correcting the illegal acts but failed to do so - went along with Haynes on the taking of Birl's property. Both Oliver and Lawson could have corrected the situation but failed to do so.

Birl asks that the Court "look at the pattern that has been established for the purpose of establishing [sic] the Texas General Revenue Fund." He says "it is believed that hundreds and hundreds, even thousands, of dollars from confiscated inmate property are turned into currency for personal activities." He states that this illegal procedure was used by the Defendants in this case; a hold in the amount of $170.00 was placed on his account, and then, by an illegal liquidation procedure, his commissary products worth $74.79 were reduced to $30.87, leaving a balance due of $138.13. He contends that what the Defendants did was take legally authorized commissary, purchased with legally authorized funds, took the currency amount from the "Texas General Revenue Fund" and made a payment to the Inmate Trust Fund. He reiterates that the money came from his sister and was acquired lawfully.

Finally, Birl says, the defendants assert that he "testified" that the money was a gift for planning a birthday party and for helping Richard Kussmaul with his legal work. A previous attorney on the case stated in the Fifth Circuit Court of Appeals that "the transfer, officials allege, was a payment by another inmate for legal services." Now, Birl says, the defendants are trying to enlarge this accusation by adding the words "birthday party." He denies ever testifying to any of these accusations and says that the Court should consider imposing sanctions on the defendants for acting in bad faith.

<u>Birl's Summary Judgment Evidence</u>

The first item of evidence Birl includes is a copy of the letter from his sister, in which she says that she has sent him $75.00. The second item is a commissary purchase receipt dated September 16, 2009, showing a number of purchases for items such as snack foods, cough drops, and lotion.

Birl has a trust record dated September 30, 2009, which shows deposits for $75.00 from his sister, a commissary withdrawal of $74.79, and a deposit of $100 from a source which is not clear. This document also reflects a $170.00 hold being placed on the account for an investigation. The final document attached is Birl's affidavit, essentially repeating the allegations made in his motion.

Birl also attached a number of documents to his response to the answer, and these will be considered as summary judgment evidence as well. The first item is a letter which Birl wrote to the head of the Inmate Trust Fund on October 19, 2009, asking that the hold be released . He states that there was no evidence to support the charge of trafficking and trading and that there was no basis for a hold because the offense of trafficking and trading does not require that an account be frozen, and the imposed punishment did not include the hold or a withdrawal.

The second item is a second letter which Birl sent to the Inmate Trust Fund Department, stating that none of the legal procedures for forfeiture of money from an inmate's account have been followed. He says that the Department is holding his money hostage without lawful authority, and that he received no notice that his account would be closed nor has he had the opportunity to be heard.

The third item is a letter sent by Birl to the Inmate Trust Department on January 24, 2011. In this letter, Birl says that Major Fisher ordered his account closed as a result of a request from Sgt. Haynes, who had conducted an investigation into possible extortion. No evidence of extortion was found, and so as a result of retaliation by Haynes to "file something," he was charged with trafficking and trading. Nothing was assessed against him in the form of damages, and he has not undergone forfeiture, garnishment, or seizure proceedings. Since his account was closed, Birl says, his account has remained closed and he has been denied access to funds to which he has exclusive rights of ownership.

Fourth, Birl attaches a copy of a Step One grievance which was screened (returned unprocessed) as redundant. His fifth exhibit consists of two copies of book orders from Kathy Kussmaul, dated October of 2007 and April of 2008, apparently reflecting that she ordered books to be sent to Birl.

The sixth exhibit is an affidavit from Richard Kussmaul, attesting that he did not receive a benefit from his mother sending money to Birl. He says that he met Birl in 1998 and that Birl has been a friend of the family since 1999-2000. Kussmaul acknowledges that his mother has purchased

books for Birl and that "she would send him small amounts of funds to his trust fund account because she either wanted to or I would have previously requested her to send him something during the visits with my mother." He states that when he did this, Birl knew nothing about it until after Kussmaul returned from the visit and told Birl that his mother was going to send Birl some money for commissary or book purchases. Richard Kussmaul states that Birl never asked him for money or for Kussmaul's mother to send him money.

The seventh exhibit is a letter from Kathy Kussmaul to Warden Debbie Erwin dated October 11, 2009. She says that she does not understand why some inmates are being punished for accepting money from her; she states that her son has his own money and that he did not benefit from Kathy sending money to any other inmates. She says that she sent the money to help these other inmates with food so that they would not have to eat in the chow hall, where conditions are "not clean." Kathy Kussmaul apologizes for sending the money and says that she did not know that she was doing anything wrong until Sgt. Haynes "called me and attempted to intimidate me." She states that she is going to file an official complaint against Haynes for this.

Kathy Kussmaul goes on to say that Richard sent her a copy of the complaint (i.e. the disciplinary case) filed against him on October 6, 2009, and that there is no proof that Richard had her send the money. She says that Richard has already been punished and asks why he was moved from the dorm. She states that Richard spent time in lockup and on cell and commissary restrictions, so why can't he return to his dorm and his friends in the garment working factory.

Kathy states that if she has to, she will get a lawyer, and make Sgt. Haynes produce the proof that Richard told her, Kathy, to send the money. As for paying back the money, Kathy asks who gets it, and questions whether it shouldn't be sent back to her.

The response to this letter, dated October 25, 2009, says that agency policy strictly prohibits deposits from one offender to another, and that deposits from one inmate to another, processed through an outside person or bank, will be considered a violation of TDCJ trafficking and trading rules. Confirmed violations may result in disciplinary action against one or both inmates, including

forfeiture of the funds. Forfeited funds are placed in the State of Texas General Revenue Fund. Warden Erwin also stated that Kussmaul has been assigned a job and housing assignment in accordance with the TDCJ Classification Plan and that inmates receive a copy of the inmate orientation handbook and the disciplinary rules, so they are responsible for adhering to the rules of the agency.

An affidavit from inmate Rosendo Garcia states that he also had property confiscated on September 23, 2009, by Sgt. Haynes, who told him several hours afterward that he was under investigation for extortion. Like Birl, Garcia says that Haynes told him that if she did not file extortion charges, he would get his property back in 30 days.

The final item attached by Birl is an affidavit from inmate Michael Waller, which says that Waller has given postage stamps and envelopes periodically to Birl as a gift to help him with his legal activities. On June 8, 2012, Birl came to Waller and asked that he loan or give him a stamp and envelope to mail a letter to the court. Officer Paula Jones came with Birl to the cell; Jones had a six-month print out form but would not give it to Birl unless Birl mailed it out, sealed, at that time. Waller says that he gave Birl the stamp and envelope and Birl used it right then. Waller also states that he has seen Birl selling his food trays, borrowing stamps and envelopes, and also borrowing such items as toothpaste and deodorant because he, Birl, cannot make commissary.

<u>Legal Standards and Analysis</u>

Birl argues at length that the seizure of his commissary goods and the freezing of his account were unlawful and done in violation of TDCJ rules and regulations. The doctrine of <u>Parratt v. Taylor</u>, 451 U.S. 527 (1981) (overruled in part on grounds not relevant here) and <u>Hudson v. Palmer</u>, 468 U.S. 517 (1984), known collectively as the *Parratt/Hudson Doctrine*, states that a random and unauthorized deprivation of a property or liberty interest does not violate procedural due process if the State furnishes an adequate post-deprivation remedy. *See* <u>Caine v. Hardy</u>, 943 F.2d 1406, 1412 (5th Cir. 1991). Three predeprivation conditions must exist before the doctrine can be applied. These are: (1) that the deprivation be unpredictable; (2) that predeprivation process be impossible,

making any additional safeguard useless; and (3) that the conduct of the state actor be unauthorized. Where these conditions exist, the State cannot be required to do the impossible by providing predeprivation process. Charbonnet v. Lee, 951 F.2d 638, 642 (5th Cir. 1992), *citing* Zinermon v. Burch, 494 U.S. 113 (1990); Myers v. Klevenhagen, 97 F.3d 91, 94-95 (5th Cir. 1996). Hudson holds that the random and unauthorized deprivations of property by prison officials, even when intentional, do not violate the Due Process Clause of the Fourteenth Amendment provided that an adequate state post-deprivation remedy exists. Hudson, 468 U.S. at 533.

By contrast, the "adequate post-deprivation remedy" analysis does not apply where the taking was done pursuant to an established state procedure, and the lawsuit challenges the procedure itself. *See* Carmona v. Branstuder, 68 F.3d 470, 1995 WL 581807 (5th Cir., September 18, 1995), *citing* Logan v. Zimmerman Brush Co., 455 U.S. 422, 435-36 (1982). In Carmona, the plaintiff complained that some of his property was missing after a search by prison personnel. The Fifth Circuit observed that the plaintiff did not challenge the procedures for searching prisoners' cells, but instead argued that the defendants took his property and then did not follow established prison procedures; this was held to be a random and unauthorized deprivation rather than a challenge to an established state procedure.

The distinction between these theories was discussed in Holloway v. Walker, 784 F.2d 1287, 1292 (5th Cir. 1986). In that case, the plaintiffs claimed that they were deprived of property through a judicial proceeding presided over by a biased and corrupt judge. The Fifth Circuit held that the plaintiffs were not challenging the validity of the established procedure, but the allegedly illegal and unauthorized actions of the judge; because an adequate state post-deprivation remedy existed, the plaintiff's federal claims were barred by Parratt and Hudson. The Fifth Circuit specifically observed on rehearing that random and unauthorized deprivations of property or liberty interests may be made even by high-ranking officials with the power to grant pre-deprivation hearings. Holloway v. Walker, 790 F.2d 1170, 1173 (5th Cir. 1986) (opinion on rehearing).

In the present case, Birl refers multiple times to the "unlawful taking" of his commissary property and the "unauthorized hold" being placed on his account; he argues that the taking of his property and the placement of the hold were not assessed as punishments at the hearing and violated TDCJ rules concerning the forfeiture of property. He does not challenge the state policies and procedures themselves, and in fact says in the motion for summary judgment that his commissary property was "confiscated and used for personal benefits, parties, club gatherings, etc., in opposition to departmental policies."

Birl goes on to complain of the allegedly illegal and unauthorized actions of the prison officials whom he says confiscated commissary property although it had been purchased with money obtained lawfully, and then placed on a hold on his account although the account contained only money which he had received from his sister and from an insurance company. He thus argues that seizure of his property and the subsequent hold on his trust account were the result of random and unauthorized acts - Haynes' decision to confiscate his property and not return it even though there was no evidence of extortion, and to place a hold for $170.00 on his account, effectively forfeiting that sum of money - rather than stemming from the authorized enforcement of an established state procedure.

As a result, Birl's claims fall within the *Parratt/Hudson Doctrine*, meaning that the Defendants' actions do not violate procedural due process if the State furnishes an adequate post-deprivation remedy. Caine, 943 F.2d at 1412. The Texas state administrative and judicial systems provide an adequate state post-deprivation remedy. Tex. Gov. Code Ann. art. 501.007 (Vernon Supp. 1994); *see also* Murphy v. Collins, 26 F.3d 541, 543-44 (5th Cir. 1994). Consequently, the appropriate forum for the plaintiff's claims lie in state court or in the administrative procedures of TDCJ-CID rather than federal court. Simmons v. Poppell, 837 F.2d 1243, 1244 (5th Cir. 1987).

This conclusion is buttressed by Austin v. Ward, 92 Fed.Appx. 80, 2004 WL 304186 (5th Cir., Feb. 17, 2004), in which the Fifth Circuit stated that the forfeiture of $1,200.00 from inmate

Austin's trust account did not violate due process even if it was unauthorized because the inmate had a meaningful state post-deprivation remedy such as a state-law tort action for conversion.

The fact that the alleged deprivation in the present case resulted from an investigation and subsequent disciplinary hearing does not take the case outside of the ambit of Parratt and Hudson. Birl argues that the disciplinary case was unlawful and that he was found guilty with no evidence; this is akin to the situation in Holloway, in which the challenge was made to the allegedly unlawful actions of the decision-maker, rather than the process itself. Birl's claims for the taking of his property and the hold placed on his account are barred by the *Parratt/Hudson Doctrine* because adequate state post-deprivation remedies exist for the taking of his property.

The Fifth Circuit's holding in Allen v. Thomas, 388 F.3d 147, 149 (5th Cir. 2004), is not to the contrary. In that case, the plaintiff Billy Allen complained that his typewriter and radio were confiscated under authority of TDCJ Administrative Directive 03.72, which directive he claimed to be unconstitutionally vague and in violation of First Amendment free speech protections. The Fifth Circuit held that the undisputed facts revealed that Allen's property was confiscated under authority of a prison administrative directive and so the confiscation was not a random and unauthorized act, taking the case outside of the *Parratt/Hudson Doctrine*. The challenge there was to the validity of the administrative directive itself rather than to the allegedly unlawful actions of prison officials, whereas Birl does not complain of the validity of the TDCJ regulations themselves, but asserts that the Defendants acted in violation of these regulations.

Even if Birl's pleadings were somehow construed to raise claims arising under Logan and Allen rather than Hudson and Parratt, these claims would nonetheless lack merit because Birl has not shown that he was denied procedural due process. He states that the disciplinary case "ratified" the unlawful seizure of his property, but he does not dispute that he received notice of the charges and that a hearing was held; instead, Birl argues that he was found guilty on no evidence and that he was not allowed to offer evidence of previous book orders.

As a general rule, notice of charges and an opportunity to be heard are the touchstones of due process in the context of prison disciplinary matters. Wolff v. McDonnell, 418 U.S. 539, 563-66 (1974). The Fifth Circuit has stated that the federal courts cannot retry every prison disciplinary dispute; rather, the court may act only where arbitrary or capricious action is shown. Stewart v. Thigpen, 730 F.2d 1002 (5th Cir. 1984). This means that prison disciplinary proceedings will be overturned only where there is no evidence whatsoever to support the result reached. Smith v. Rabelais, 659 F.2d 539 (5th Cir. 1981); *see also* Adams v. Gunnell, 729 F.2d 362, 370 (5th Cir. 1983) (hearing officer's decision will be upheld when it is supported by "some facts ... any evidence at all.") An officer's report, by itself, is sufficient to support a finding of guilt. Hudson v. Johnson, 242 F.3d 534, 536-37 (5th Cir. 2001). The district court, in reviewing this issue, need not conduct a *de novo* factual review. Smith, 659 F.2d at 545.

The records of the disciplinary hearing show that Birl received notice on October 8, 2009, that he was charged with making an unauthorized commodity transfer from Richard Kussmaul in that Kussmaul had his mother deposit money totaling $170.00 to Birl's trust fund account. The hearing was held on October 9, 2009, at 11:02 a.m., giving Birl 24 hours notice.

At this hearing, Birl testified that he had known Richard Kussmaul since 1994 and Kathy Kussmaul since 2004, and that she had bought him books in the past. He denied asking either Richard or Kathy for anything.

Sgt. Haynes testified that she was conducting an investigation into Kussmaul and discovered that Kussmaul's mother had sent money to Birl and others. When she interviewed Birl, he told her that he and Kussmaul were going to have a birthday together and that he had been helping Kussmaul with some legal work. Birl stated that when Kussmaul had visits with his mother, he would come back and tell Birl that his mother had put money on Birl's books. Birl also told Haynes that he had "known her for years."

Haynes testified that Birl did not admit to asking for money, nor did he state that he was getting paid for legal work. She said that Birl did not state whether or not he knew about the

deposits before they occurred, but noted that inmates get monthly statements so he was obviously aware that he was receiving money. In another statement, recorded on the service investigation worksheet, Haynes stated that it was not approved through the administration for Kussmaul to put money on Birl's books. She said that she had spoken to Kussmaul's mother and she, Kathy, claimed her son asked her to send money to offenders, and that Richard told her how much to send and to whom.

The TDCJ Inmate Orientation Handbook provides as follows:

> In general, offenders may not receive gifts or fees from other offenders. A deposit from one offender to another may be made only by transfer from one Inmate Trust Fund (ITF) account to another and must have unit administrative approval. This approval must be obtained even if the depositing offender has made previous deposits to the receiving offender's account.
>
> Deposits from one inmate to another, processed through an outside person or bank, shall be considered a violation of the TDCJ Trafficking and Trading Rules regardless of whether accepted for deposit or received by the ITF [Inmate Trust Fund] Department. Confirmed violations of deposits between offenders may result in disciplinary action against any offenders involved in any unauthorized transactions, whether depositors or recipients. If an offender reports unauthorized transactions that are afterward determined to be in violation of the stated policy and voluntarily signs a waiver for forfeiture of the funds received, no disciplinary action will be taken.
>
> Moreover, funds gained through extortion (by coercion, deception, or violence) may be forfeited. If an offender is found guilty of extorting money that has been deposited in his trust fund account, **or has been received without authorization as described above**, the offender shall forfeit title to the funds.

TDCJ Offender Orientation Handbook (available on-line at http://www.tdcj.state.tx.us/publications/ pubs_cid_offender_orientation_handbook.html), p. 46 (emphasis added). The offense of trafficking and trading is defined in the TDCJ Disciplinary Handbook, available online at http://www.tdcj.state. tx.us/publications/index.html, as "the unauthorized buying, selling, exchange, or transfer of any commodity from any individual, other than making authorized purchases from the commissary (evidence may include an excessive inventory of marketable items). This includes the unauthorized transfer of money from one offender to another, whether the transfer is direct or indirect."

Haynes' testimony that Kathy Kussmaul had said that Richard told her what inmates to send money to, and how much, is some evidence that Kathy Kussmaul's deposits were in effect transfers

of money from Richard to these other inmates, in violation of TDCJ trafficking and trading rules. Although Birl testified that he had known the Kussmaul family for years, the TDCJ records show that Kathy Kussmaul had made deposits to the accounts of no fewer than 14 inmates other than her son, with such deposits totaling $3,568.00 between January of 2008 and September of 2009. While it may be true that Kathy Kussmaul purchased books for Birl as well as sending him money, this is irrelevant to the question of whether Birl and Richard Kussmaul engaged in trafficking and trading through unauthorized deposits of money. There was some evidence presented in the disciplinary hearing, through Sgt. Haynes' statements and her report and testimony, to support the finding of guilt. Birl's claim that he was denied due process in that the finding of guilt was supported by no evidence is without merit.

Furthermore, even if Birl was correct that he was found guilty with no evidence, this would be a "random and unauthorized act" and not an established state procedure; no established state procedure permits disciplinary hearing officers to find inmates guilty without evidence. Holloway, 784 F.2d at 1292 (deprivation of property through a judicial proceeding presided over by a biased and corrupt judge represented a random and unauthorized act); Orsack v. Director, TDCJ, civil action no. 9:08cv196, 2008 WL 5377985 (E.D.Tex., December 22, 2008, appeal dismissed through denied of certificate of appealability) ($100.00 hold placed on inmate trust account after conviction for trafficking and trading did not violate due process because meaningful state post-deprivation remedies existed, citing Austin).

Nor has Birl shown that the taking of his property and the subsequent hold on his account denied him due process. Even assuming that such actions were undertaken pursuant to and in conformity with an established state procedure, Birl received the process he was due through his opportunity to contest the allegations in the disciplinary proceeding. This proceeding concluded that Birl had engaged in trafficking and trading in the amount of $170.00, which sum was "received without authorization" and thus subject to forfeiture.

The fact that Birl no longer had any money which had been sent to him by Kathy Kussmaul does not change the fact that he was liable for the sum of $170.00 in unauthorized receipts because he was convicted of the disciplinary offense of trafficking and trading in this amount. His commissary purchases were confiscated and a hold put on his account because of his indebtedness in this amount, which was validated by the disciplinary proceeding wherein it was determined that Birl had engaged in trafficking and trading in the amount of $170.00. Even if Birl's pleadings were to be read to assert that he was denied due process through the operation of an established state procedure, taking the claim outside of the *Parratt/Hudson Doctrine*, such a claim would lack merit because Birl has not shown that he was denied the process he was due. Austin, 94 Fed.Appx. at *82.

In summary, Birl's pleadings plainly assert that the takings of which he complains were not done pursuant to established state procedures, and he challenges the allegedly unlawful acts of the defendants rather than the operation of the state procedures themselves. As such, his claims fall within the *Parratt/Hudson Doctrine* and his due process claims fail because of the existence of adequate state post-deprivation remedies, as the Fifth Circuit explained in Austin. Even if Birl's claims were examined outside of the *Parratt/Hudson Doctrine*, however, these claims would fail because Birl has not shown that he was denied the process he was due.

Birl's claims against Captain King fail because these claims assert that King denied him due process in the disciplinary hearing, and Birl has not shown that any such denial occurred. As noted above, there was some evidence to support the finding of guilt. Although Birl complains that King would not allow him to introduce evidence that Kathy Kussmaul had purchased books for him in the past, he fails to show that such orders have any bearing on whether or not Kathy was effectively transferring money from Richard to Birl by following Richard's instructions on what inmates to give money and how much to give them.

There is no right to submit irrelevant evidence in disciplinary proceedings. Cotton v. Keffer, civil action no. 4:12cv517, 2012 WL 6115956 (N.D.Tex., November 2, 2012, *Report adopted at* 2012 WL 6129366 (N.D.Tex., December 10, 2012)), *citing* Wolff, 518 U.S. at 566. Furthermore,

the Fifth Circuit has rejected a claim of liability against a prison disciplinary hearing officer for refusing to correct a allegedly fabricated incident report, threatening the plaintiff, imposing a punishment exceeding the allowable maximum, and making "numerous false statements in his reports to cover up his malicious acts." Sun v. U.S., 49 F.3d 728, 1995 WL 103351 (5th Cir., March 1, 1995). Birl has failed to show any viable claim against Captain King, the disciplinary hearing officer.

Birl's claims against Oliver and Lawson also lack merit. These claims are premised on the theory that Oliver and Lawson failed to grant him the relief he sought in his grievances. The Fifth Circuit has held that inmates do not have a constitutionally protected liberty interest in having grievances resolved to their satisfaction, and so there is no violation of due process when prison officials fail to do so. Geiger v. Jowers, 404 F.3d 371, 373-74 (5th Cir. 2005); *see also* Edmond v. Martin, 100 F.3d 952, 1996 WL 625331 (5th Cir., Oct. 2, 1996) (prisoner's claim that a defendant "failed to investigate and denied his grievance" raises no constitutional issue; Thomas v. Lensing, et al., 31 Fed.Appx. 153, 2001 WL 1747900 (5th Cir., Dec. 11, 2001) (same). Even assuming the accuracy of Birl's claim that supervisory officials have a "duty" to correct constitutional violations, he has failed to show that he is entitled to any relief because he has not shown that a constitutional violation occurred, much less that Oliver or Lawson knew or should have known that such a violation had occurred. His claims against these Defendants are without merit.

Birl also alludes, in an oblique manner, to a claim of retaliation. He states at one point that he was deprived of his commissary property by the acts of the defendants that are being used as punishment and in retaliation for resisting the wrongful confiscation of his property; he also contends that Haynes retaliated against him by filing the trafficking and trading charge when she realized that extortion charges would not stand up.

The Fifth Circuit has held that the elements of a claim under a theory of retaliation are the invocation of a specific constitutional right, the defendant's intent to retaliate against the plaintiff for his exercise of that right, a retaliatory adverse act, and causation, which is a showing that

29

but for the retaliatory motive, the action complained of would not have occurred. Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997). This requirement places a heavy burden upon inmates, because mere conclusory allegations will not suffice; instead, the inmate must produce direct evidence of retaliation or, the more probable scenario, a chronology of events from which retaliation may plausibly be inferred. Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995). The relevant showing must be more than the prisoner's personal belief that he is the victim of retaliation. Johnson, 110 F.3d at 310, *citing* Woods v. Edwards, 51 F.3d 577, 580 (5th Cir. 1995). The Fifth Circuit has also stated that a prisoner who asserts a retaliation claim must assert specific facts; mere conclusory allegations are not enough. Whittington v. Lynaugh, 842 F.2d 818, 820 (5th Cir. 1988); Moody v. Baker, 857 F.2d 256, 258 (5th Cir. 1988).

In this case, Birl has failed to show that any adverse action was taken against him because he sought to exercise a constitutionally protected right. Nor has he shown that but for any retaliatory intent, the actions of which he complains would not have occurred. The summary judgment evidence shows that Birl was charged with trafficking and trading after an investigation revealed that he had received deposits to his inmate trust account from the mother of another prisoner, who told the investigator that her son had specified what inmates should receive deposits and for how much. Birl offers nothing to show that despite this, he would not have been charged with trafficking and trading but for retaliatory intent, nor does he point to a chronology from which such a conclusion could reasonably have been inferred. His contention that the deprivation of his property was in retaliation for his resisting the confiscation of his property is circular and wholly fails to support a retaliation claim. Birl's claim on this point is without merit.

The Defendants also assert that Birl did not exhaust his administrative remedies on his claim that he was not allowed to offer the book orders into evidence at his disciplinary hearing. A review of Birl's grievances concerning the disciplinary show that Birl complained at Step One that there as no evidence showing that he knew or participated in a transfer of funds, the evidence did not show

a deposit on October 7, 2009 as alleged, no statement by Richard Kussmaul was offered to support the charge, and he had no knowledge of or participation in the transaction.

In his Step Two appeal of this grievance, Birl asserts that there was no evidence that he participated in a monetary transfer, he was found guilty on no evidence, the offense report did not specify why the money had been deposited into his account, there was no evidence that he knew beforehand that a deposit would be made, there was no evidence that a deposit was made on the date and time listed on the offense report, the evidence presented at the hearing supports his innocence because it did not prove that he knowingly had any part in the transaction, and the Step One grievance gave him a "standard response" without investigating his claims.

Neither Birl's Step One nor his Step Two grievance makes any mention of a claim that he was denied due process in that the hearing officer did not allow him to introduce evidence. As a result, the Defendants' contention that this claim is unexhausted is correct. Johnson v. Johnson, 385 F.3d 503, 517 (5th Cir. 2004) (in order to exhaust a claim, the grievance must provide administrators with a fair opportunity under the circumstances to address the problem which will later form the basis of the claim).

.                                          Immunity

The Defendants first invoke the doctrine of Eleventh Amendment immunity, contending that this doctrine protects them from claims for damages in their official capacities. This assertion is correct. Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 101-02 (1984); *accord*, Hafer v. Melo, 112 S.Ct. 358, 363 (1991); Delahoussaye v. City of New Iberia, 937 F.2d 144, 146 (5th Cir. 1991). The application of Eleventh Amendment immunity is based on the fact that a lawsuit for damages, brought against public officials in their official capacities, is in effect brought against the State of Texas itself, and thus barred by the Eleventh Amendment and the doctrine of sovereign immunity. *See* Hafer, 112 S.Ct. at 363; Oliver v. Scott, 276 F.3d 736, 742 (5th Cir. 2002) (noting that the Fifth Circuit has "twice held that the Eleventh Amendment bars recovering §1983 money damages from TDCJ officers in their official capacity").

31

Birl argues against the invocation of Eleventh Amendment immunity, citing Quarterman v. Hampton, 321 S.W.3d 864 (Tex.App.-Houston [1st Dist.] 2010, no pet.). That case does not concern the Eleventh Amendment, but rather the applicability of Section 101.106 of the Texas Civil Practice and Remedies Code; the state appellate court held that the filing of a lawsuit against prison officials in their official capacities was not the same as a lawsuit against a "governmental unit" within the meaning of Section 101.106. The application of state law by a state court says nothing about the immunity granted by the Eleventh Amendment to the United States Constitution. The Defendants' invocation of Eleventh Amendment is meritorious; however, as noted above, this immunity applies only to claims for monetary damages, to the extent that such claims are brought against the defendants in their official capacities.

The doctrine of qualified immunity applies to claims for monetary damages brought against a government official in his or her individual capacity. The Fifth Circuit has stated that a qualified immunity defense serves to shield a Government official from civil liability for damages based upon the performance of discretionary functions if the official's actions were reasonable in light of then clearly existing law. Atteberry v. Nocona General Hospital, 430 F.3d 245, 253 (5th Cir. 2005), *citing* Thompson v. Upshur County, 245 F.3d 447, 456 (5th Cir. 2001).

Although qualified immunity is nominally an affirmative defense, the plaintiff bears a heightened burden to negate it once it is properly raised. Brumfield, 551 F.3d at 326; *see also* McClendon v. City of Columbia, 305 F.3d 314, 323 (5th Cir. 2002) (noting that when a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense).

The Fifth Circuit has stated that to discharge this burden, the plaintiff must satisfy a two-prong test. First, he must claim that the defendants committed a constitutional violation under current law, and second, that the defendant's actions were objectively unreasonable in light of the law which was clearly established at the time of the actions complained of. Atteberry, 430 F.3d at

253; <u>Kinney v. Weaver</u>, 367 F.3d 337, 349-50 (5th Cir. 2004). These two prongs may be considered in either order. <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).

In this case, Birl has shown neither a constitutional violation nor that any of the Defendants acted in an objectively unreasonable manner in the light of clearly existing law. He has not shown that the seizure of his property, in the course of a trafficking and trading investigation, was unreasonable, nor that a reasonable prison official would have believed that the conduct of the disciplinary case violated clearly established law. Birl has failed to overcome the defense of qualified immunity.

Nor has Birl shown any entitlement to the declaratory and injunctive relief which he seeks, including the return of the confiscated commissary items, the lifting of the hold, restoration of the good time taken as well as that which he would have earned but for the disciplinary case. The Fifth Circuit has stated that in order to obtain permanent injunctive relief, a plaintiff must demonstrate that he has suffered an irreparable injury, that remedies at law such as monetary damages are inadequate to compensate for that injury, that considering the balance of hardships between the plaintiff and the defendant, a remedy in equity is warranted, and that the public interest would not be disserved by a permanent injunction. <u>ITT Educational Services v. Arce</u>, 533 F.3d 342, 347 (5th Cir. 2008); *see also* <u>Posada v. Lamb County, Texas</u>, 716 F.2d 1066, 1070 (5th Cir. 1983) (to win a permanent injunction, a plaintiff must show a clear threat of continuing illegality portending immediate harmful consequences irreparable in any other manner). Birl has failed to show that he suffered irreparable injury as a result of any wrongful acts by the defendants, that a remedy in equity is warranted, or that the public interest would not be disserved by an injunction. His claims for declaratory and injunctive relief, like his claims for monetary damages, are without merit.

## Conclusion

On motions for summary judgment, the Court must examine the evidence and inferences drawn therefrom in the light most favorable to the non-moving party; after such examination, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Securities and Exchange Commission v. Recile, 10 F.3d 1093, 1097 (5th Cir. 1994); General Electric Capital Corp. v. Southeastern Health Care, Inc., 950 F.2d 944, 948 (5th Cir. 1992); Rule 56(c), Fed. R. Civ. P.

To avoid summary judgment, the non-moving party must adduce admissible evidence which creates a fact issue concerning existence of every essential component of that party's case; unsubstantiated assertions of actual dispute will not suffice. Thomas v. Price, 975 F.2d 231, 235 (5th Cir. 1992), *citing* Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Fifth Circuit has stated that once the moving party has met its burden, the non-movant must direct the court's attention to admissible evidence in the record which demonstrates that it can satisfy a fair-minded jury that it is entitled to a verdict in its favor. ContiCommodity Services, Inc. v. Ragan, 63 F.3d 438, 441 (5th Cir. 1995).

Summary judgment should be granted when the moving party presents evidence which negates any essential element of the opposing party's claim, including a showing that an essential element of the opposing party's claim is without factual support. First American Bank & Trust of Louisiana v. Texas Life Ins. Co., 10 F.3d 332, 334 (5th Cir. 1994). The granting of summary judgment is proper if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Caldas & Sons v. Willingham, 17 F.3d 123, 126 (5th Cir. 1994). Once the movant makes this showing, the burden shifts to the non-movant to come forward with evidence sufficient to establish the existence of a genuine issue of material fact. Caldas, 17 F.3d at 126-27.

Although the Court must draw all inferences in favor of the party opposing the motion, an opposing party cannot establish a genuine issue of material fact by resting on the mere allegations of the pleadings. Hulsey v. State of Texas, 929 F.2d 168, 170 (5th Cir. 1991); *see also* Gordon v. Watson, 622 F.2d 120 (5th Cir. 1980) (litigants may not oppose summary judgment through unsworn materials). Similarly, a bald allegation of a factual dispute is insufficient, in itself, to create a

genuine issue of material fact. <u>Recile</u>, 10 F.3d at 1097 n.15. A non-movant cannot manufacture a factual dispute by asking the Court to draw inferences contrary to the evidence. <u>Matsushita Electric Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986). In short, a properly supported motion for summary judgment should be granted unless the opposing party produces sufficient evidence to show that a genuine factual issue exists. <u>Hulsey</u>, 929 F.2d at 170, *citing* <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

The Fifth Circuit has stated that once the defendants have shifted the burden to the plaintiff by properly supporting their motion for summary judgment with competent evidence indicating an absence of genuine issues of material fact, the plaintiff cannot meet his burden by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). The Court added that "summary judgment is appropriate in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the non-movant." <u>Little</u>, 37 F.3d at 1075.

The fact that a non-movant failed to respond to a motion for summary judgment is not itself a basis for granting that motion; rather, the movant has the initial burden of proof to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law. <u>John v. State of Louisiana Bd. of Trustees for State Colleges and Universities</u>, 757 F.2d 698, 708 (5th Cir. 1985). Once the movant has done so, the burden then shifts to the plaintiff, who must identify specific evidence in the record and articulate the precise manner in which that evidence supports his claims; the district has no duty to sift through the record in search of evidence to support a party's opposition to summary judgment. <u>Stults v. Conoco, Inc.</u>, 76 F.3d 651, 656 (5th Cir. 1996). As for material facts on which the plaintiff will bear the burden of proof at trial, he must come forward with evidence sufficient to enable him to survive a motion for directed verdict at trial. <u>Stults</u>, 76 F.3d at 656; *see also* <u>Johnson v. Deep East Texas Regional Narcotics Trafficking Task Force</u>, 379 F.3d 293,

301 (5th Cir. 2004) (non-movant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim).

In this case, the pleadings and the summary judgment evidence show that there are no disputed issues of material fact and that the Defendants are entitled to judgment as a matter of law because Birl's claims are foreclosed by the existence of adequate state post-deprivation remedies and because Birl failed to show a denial of due process in any event. It is accordingly

ORDERED that the Defendants' motion for summary judgment (docket no. 50) is hereby GRANTED. It is further

ORDERED that the above-styled civil action be and hereby is DISMISSED with prejudice as to its refiling in federal court, but without prejudice as to any claims in state court or through the administrative processes of TDCJ-CID which Birl may elect to pursue. Finally, it is

ORDERED that any and all motions which may be pending in this civil action are hereby DENIED.

So **ORDERED** and **SIGNED** this **4** day of **April, 2013.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE